without evidence of impairment, which we didn't have here, but plaintiff repeatedly insinuated that Mr. Awwad either didn't take the test or his test results were unknown and there was no reason to be talking about a blood alcohol test to talk about credibility of Ms. Naser, which is what's been argued in the brief. We were that they were really just trying to assess her credibility and whether her signature on the form, the authorization form for the blood alcohol test, there was no objection, not you, but there was no objection by the defendants at trial. There was no objection when the evidence came in. There was a motion in Lemonade beforehand, and that's why we have argued plain error. So we acknowledge plain error. Error. Okay. I understand. Uh, is exceedingly rare in civil cases. You know that, right? Yes, it is. Okay. You have no precedent for this situation with no objections was made. It was didn't re-raise the motion in Lemonade, uh, at trial. And so why, uh, is this, this, this is so serious. We don't know. Uh, you're guessing about what the effect is on the jury, but you have no cases that, uh, would allow us to have precedent, uh, for your argument that this is plain error. There are cases discussing what plain error is. They're fact specific. We do not have a case where alcohol and the results of an alcohol blood test were mentioned 18 times in questioning witnesses and was raised again before the jury in closing argument where the plaintiff asked, where are the results of the blood alcohol test? We don't know, but I submit that this is a case of plain error. We know this topic is prejudicial. We know talking about alcohol consumption and potential intoxication is prejudicial in the context of a car, a vehicle accident. We know that there's cases where there's been reversible error for that. We don't know what the result of the BAC was. We have no idea what the result is. Right. The jury was left to speculate on that. And if it wasn't, you could, if you had the evidence, you could have said something, you could have 18 times, you could have objected. Where, where, where's the harm here? Well, again, on plain error, we are acknowledging that there was no objection. So that is a given. That's a given. It's not a criminal case. So again, you have to show something exceedingly rare. Okay. Exceedingly. It's very rarely done. I agree. I agree with you wholeheartedly. I don't think there are a lot of cases with this amount of reference to alcohol testing and the results, the unknown results of an alcohol blood test that was repeatedly placed in front of the jury. And it was then emphasized in closing argument And then to compound that there was a missing evidence instruction. So the jury could have, in light of the fact that it was drilled into their heads, that the blood alcohol test results were unknown. And then they get a missing evidence instruction that says, well, if the test was given and it should have been turned over, but it wasn't, you can assume that it would have been adverse to the defendants. So I agree. This is a very unusual case. In our system of justice, how do we get around the fact that there were no objections made? We understand that the evidence was not supposed to be admitted, but there was no objection. Understood. Stuck there. So help us with that. Your way around it is the plain error doctrine. I agree. It's not often used. It shouldn't be often used. It should be reserved for very special cases. I do not know why objections weren't made. I can guess maybe why they weren't made. But we have the record as it stands, which they were just beaten over the head. The witness, two witnesses, Ms. Naser and Mr. Fields, were repeatedly asked, didn't he have to undergo a blood test? Isn't that what the federal rules required? His blood alcohol level must be tested. We don't know. Where are those test results? You never saw the test results. I ask you, what impression does that leave you with? Doesn't that leave you with the impression that alcohol was involved in the accident? Why would you keep asking, keep asking questions about those regulations? So you're saying that the plaintiff's attorneys could not impeach Nancy Naser's testimony? They were free to impeach her testimony. Well, that's what it had to do with the signature. But the questions didn't have anything to do with that. It was their signature, and then they asked Mr. Field questions about it as well. So that's proper examination. I agree with you that asking about her signature is proper examination. Questions stating, well, don't the federal regulations require a driver who travels regionally, who gets into a collision? They have to undergo a blood alcohol test within eight hours. Wasn't this test required? Do you at least acknowledge today, we don't know what the results of the back test were? Another question is, my question, do you acknowledge today Mr. Awad was required to submit for a blood alcohol test after the collision, but we don't know what the results of that test were? What does that have to do with impeachment about her signature? Nothing. But the thing is that what we're dealing with here is that the judgment notwithstanding the verdict standard, we must view the evidence like most favorable to the plaintiff. So how do we get around that? Because as we review the evidence and like most favorable to the plaintiff, I don't see how we get around reversing a jury verdict. We are not asking for reversal on that basis. The judgment notwithstanding the verdict is a manifest way to the evidence on the fault allocation. We are not arguing that the erroneous admission of this evidence and the improper comments during closing argument would entitle us to JNOV. We are arguing that it entitles us to a new trial, that it was so prejudicial and so egregious that it deprived the defendants of a fair trial, which would only entitle us to a new trial, not a JNOV on this basis. And that was the first issue that I wanted to... Give us your second strongest argument. All right. So the second issue... That's your strongest argument and it's a good argument. The second issue addresses the missing ELD evidence, which is the electronic logging device evidence. And again, here we have a situation where there was insufficient evidence of that device being installed in the truck on the date of the accident. Mr. Awad testified that on November 15th, 2019, there was no ELD in his truck. Ms. Nacer said there was no ELD in his truck on the date of the accident. Fields could not controvert that. Fields did not say, yes, I installed it before the date of the accident. What he said was there should have been an ELD in there. And at some point there was an ELD in there. And I submit that at some point does not controvert to witnesses saying it wasn't there on this date. We don't dispute that. You're asking us to do what we can't do. We cannot reweigh the evidence. That was for the jury. The jury heard the evidence. They made a decision. What you're asking us to do then is say, well, based upon what that, they came to the wrong decision. No, I'm not asking you to reweigh it. I'm saying that that evidence shouldn't have been admitted. And especially that the missing evidence instruction. It's absolutely relevant. In fact, you just, you know, those questions, there's nothing wrong with those questions. And they're trying to establish federal regulations. And we know that there was some pictures, there was some, some information was on a computer and it was at an attorney's office that all the dash cam. That is a separate thing to do with this, with the spoilation. This is, this is a separate. So we're not talking about the spoilation. No, no. You are correct. I'm not talking about the dash cam. I'm not talking about the dash cam video at all. This is the ELD, which is completely separate from that. We did not argue. We are, the argument is that the missing evidence instruction should not have encompassed the ELD absent, at least a question as to whether the ELD was present. And we don't believe the trial court thought that there was a question of fact presented. We do not believe that that is correct. Because if Mr. Fields had said, yes, I installed it on this date and it was present in that truck on the date of the accident, that would raise a fact question between his testimony and Mr. Awad and Ms. Nazer saying it wasn't in there on the date of the accident. But we don't have that. The best he was able to do is say it was in there at some point. And it was in there at some point does not raise a fact question as to whether it was there on the date of the accident. My next question is then what is the standard review? Am I right that a standard review is abuse of discretion? Yes, you are correct on that. And it is our position that the court abused its discretion because it, its analysis was wrong. That there wasn't, the judge, the trial court ruled that the missing was present on the date of the accident. That was the basis. And we submit that that basis is incorrect because Fields' testimony that at some point there was an ELD in the truck does not raise a question of fact that there was an ELD on the date of the accident when Mr. Awad and Ms. Nazer both said on the date of the accident, there was no ELD. So if the trial court was wrong, that there was no fact question presented, then there was no basis for that missing evidence instruction to encompass the ELD. And that's completely separate from the dash cam. But the ELD also was independently argued in closing argument. Hey, we don't know what the results from the ELD, what that would have showed that evidence is gone. And they were allowed to missing evidence instruction as to the ELD. That is what we submit was an abuse of discretion because we don't have a question of fact here based on Fields' limited testimony where he could not affirmatively state that there was an ELD in that truck on the date of the accident. That is my point two. Turning to point three, because I want to make sure I get my arguments in on time, is the future loss of normal life and future pain and suffering we submit should not have gone to the jury in the absence of supporting expert testimony. We've argued in our brief that the trial court misinterpreted and misapplied the Maddox standard of objective versus subjective test for future damages. The trial court believed that the question presented was whether the plaintiff sustained an objective injury. But that's not what Maddox said. Maddox didn't say, is there an objective injury? Maddox says future pain and suffering can be objectively determined from the nature of the injury. So for example, citing relevant cases, the court said, well, if you have crushed testicles as in A.O. Smith, the nature of that injury is such that a reasonable jury can infer future damages. In Burnett, the plaintiff lost an eye and removed his artificial eyeball in front of the jury. And the court said, that's enough. We don't need expert testimony to say, yes, the jury can determine objectively that there's future damages, loss of a normal life and future pain and suffering. However, in Maddox, the plaintiff injured his left shoulder and his upper and lower back. He gave testimony very similar to the plaintiff's testimony here when asked to describe his injury. He said that his shoulder periodically still hurts. He has upper back pain every day. His lower back stiffens. He has pain every day in his upper and lower back and periodically in his shoulder. The Maddox court, this first district, said that is not sufficient. You need expert testimony to support the future damages. And this is a question of discretion too. It's not a question of law. It's a discretionary ruling by the court. Well, if they misapplied and misinterpreted Maddox, that's not a discretionary. This is discretionary. I don't believe that that is a discretionary ruling. I'm quoting. It's not an abuse of discretion standard. I'm talking about whether they were properly instructed, if the evidence legally was sufficient to allow the issue to go to the jury absent any supporting expert testimony and the court test in Maddox objective versus subjective. If the trial court misinterpreted and misapplied that legal standard, that is a question of law. That is not an abuse of discretion standard. Didn't he also testify that this pain in his shoulder and in his back interfered with his ability to take care of his special needs child? Didn't it also say that he was not able to do some of the things that he used to love to do, play certain sports, things like that. So the jury heard all that and they knew that his ability to do things was now limited. Isn't that enough? It's not enough under the objective, subjective standard. It's not enough under Maddox. Maddox, the plaintiff testified that he was in pain every day. I do want to clarify, Mr. Brungard did testify that during his period of rehabilitation, he couldn't lift his son. He testified that after his recovery was complete, and remember the expert, Dr. Burrow, his treating expert physician testified that he had full function. It was fully restored. Mr. Brungard testified he was able to lift and carry his son after his period of rehabilitation. What he said was he was afraid and concerned that he might reinjure his arm or that the tendon, the arm might give out, but he testified himself that he was able to do that. He also testified that he refrained from playing basketball, not because he was physically unable to do so, but because he felt it might aggravate his shoulder. So these are the type of subjective, subjective complaints similar to those in Maddox where this first district said you must have expert testimony to support them. And here the expert, Mr. Burrow, said he's fully functional. He is fully restored. And even the plaintiff himself, when asked, he testified, I can do everything I used to do to an extent. The real issue is that he worries he might reinjure his shoulder. And we submit that absent any expert testimony, which could easily have been obtained from Mr. Burrow, who testified by evidence deposition, absent any supporting expert testimony, that evidence from Mr. Brungard, like the plaintiff in Maddox, was not sufficient to take the issue of future damages to the jury. Certainly his past damages for pain and suffering and loss of a normal life, that was fine, but not the future. And we also want to note that even his complaints of pain, he characterized them as not significant. And he said he decided not to take pain relievers, even aspirin or ibuprofen. He said that would just mask my pain, which admittedly is point of something like aspirin or ibuprofen. He decided he didn't want to do that. And I submit that that is the definition of subjective. A different plaintiff might've taken an aspirin or taken an ibuprofen and not experienced any pain. So that's why here we absolutely required expert testimony in order to take this issue to the jury. And the jury awarded over a million dollars for future pain and suffering and future loss of a normal life. So we're not talking about an inconsequential amount. In Maddox, it was $10,000. Here, we're talking over a million dollars. So when we look at- We've got about one minute left because you still have five minutes that you're saving for rebuttal. Yes, your honors. So if we look at the exact wording of the test in Maddox, it says where future pain and suffering is not apparent from the injury itself. Here, we have a repaired slap lesion or is subjective. And here, we have subjective pain complaints from the plaintiff. The plaintiff must present expert testimony to justify the instruction. That's the hard and fast rule. So if this is an abuse of discretion standard, you would lose. Is that correct? Well, I don't want to concede that because I don't believe it's abuse of discretion. I believe it's a misapplication of the law. You're not answering my question. My question is, if it is an abuse of discretion, then you would lose. No, I'm going to say that no reasonable judge, no reasonable court would rule this way. I believe the language in Maddox is clear. I believe these are subjective pain complaints. There was a treating physician who could have been asked to render that expert opinion and was not. So I believe it's an abuse of discretion if that's the standard, but I do not believe that's the standard. And I'll stop there so I preserve my rebuttal time. Thank you, Ms. Colross. And Ms. Rosen? Good afternoon. It's a pleasure to see you all. Thank you so much for having this argument. So we see that the first two, the first Ms. Colross's best two arguments are both plain error arguments. And her third argument, I think is somewhat forfeited because I think their argument was vague, but still it doesn't make any sense. So we'll start with the blood alcohol. I believe may as well, I'm not going to bother with the JNLM or the manifest weight because I'll rest on my briefs. There was nothing said about that. First of all, the defendant, Nancy, was shown to be a liar. Her credibility was so bad, she said she had nothing to do with the company before 2021. And the blood alcohol test, you know, was taken before that. Okay. Before she had allegedly had anything to do with it. Dave Fields said he's the one who told her to go have the driver take the test. He had to have some context for it. So questioning of Mr. Fields about that was reasonable in any way you have it. So where do they get the impression that there was alcohol involved in the jury? I don't think there was any impression that that they said, we don't know. You don't think that asking that question over and over again and engaging in that kind of question would have left the jury with the impression that alcohol was involved? No, I don't because there had to be a foundation for the questioning with Mr. Fields. And then Nancy, she just kept going all over the place. No, I don't think so. I think if my trial lawyer had wanted to leave an impression about alcohol, and there had been any to leave, she would have left one, but there was none to leave at all. Nothing. I mean, there was nothing. He had nothing. No, there was nothing. There's no reason the jury would have been thinking, hmm, we have to find this. I don't, I don't, that's just concocted. And I know Justice Hyman likes to start reading briefs from the reply brief backwards. He's told us at seminars. In this reply brief, defense counsel says, why didn't plaintiff, if it wasn't as significant, why didn't plaintiff just have it redacted? Well, there's a simple answer for that because nobody asked. Nobody asked. It's not a bad question. If they had asked, I'm sure it would have been a reasonable thing to redact it. It could have been, you know, it could have been emphasized slightly less, but they didn't do it. There's, there's, there's no, there's no real argument that the jury might have been believed, should I say, that jury might have believed they were required to find that the driver was intoxicated. Don't you think this would have been a totally different case if there was any evidence that the driver was intoxicated? I think there would have been, it would have been a totally different trial, but there, but there was nothing to go on for that. So I don't, I don't see it. So. Well, other than the jury being left with this impression, as Ms. Carlos has brought to our attention, the jury was left with an impression that, okay, alcohol must have been involved here. No. Well, it must have been. I'm sorry. I'm sorry, but that's not a logical conclusion from one, from a statement of, we don't know, to it must have been. I don't think that that follows one from the other and it wasn't objected to. Well, if you, if you stop and think for a second, they found the defendant to be 95, 95% at fault, plaintiff 5% at fault. Well, that, that seems like that, that, that ratio just, it does appear to be a little off. It, it, it may be a little off and, and I can't say why that is, but it, I've been thinking about it. It could be because of Ms. Carlos' argument that, that, and that was her first, her main argument was that, that evidence that those, that questioning should not have occurred. Well, they should have, they should have. And maybe, maybe there was plain error here. I don't think so, but I think, I think that it's more likely. I'm trying to think, well, why was it so 95, 5? And, and, and, and maybe because the credibility of the defendants was poor. And is that a great reason? No, probably. No, it's not. But they, but they showed themselves to be liars time and time again. Nancy said, I never saw the video, the dash cam video. I, I saw it. I never looked at it. I might've had it. I might've sent it to my lawyer. It was ridiculous. Her, her credibility, this was a case that turned a lot on credibility. Both my, my plaintiff was, was properly in the, the intersection because the statute allows him to go into the intersection and wait until the, the, the car's going through the intersection, proceed before he can safely make a left turn. We get it. They act like that. That's the biggest thing in the world here that they didn't do anything wrong. That running a red light is nothing. The same statute requires him to stop for a red light. So the story, how fast he was going, everything counts here. I mean, the defendant testified, Oh, maybe I was going 20, 25. The eyewitness said maybe he was going 40, 45. He said he sounded his horn. He said, I put on my brakes. He sounds like a very reasonable thing. Like he's got no reason to, to think there could ever be anything wrong because he's doing everything right. Well, that's, that's not true. I mean, it may, it was, it was contradicted by the testimony of Mr. Gonzalez who said no horn, no sound to brakes, no slowing down, red light. So, so then they put the fault on him. And then I, so why did they give so much? I know in the defendant's cases that they cite Lewis, there's a few cases they they're all Lewis, I'm sorry, and Lang. They're both manifest way to the evidence cases. And the court affirms the findings and the, and the comparative fault was much higher in those cases than it is in this case. But here my plaintiff was doing the right thing. And then he didn't see he, he, he, his, his problem was he wasn't clairvoyant. He didn't see that there was a semi behind the Cadillac that was running the red light. That that's what happened here. And so I think that's what counts for, for this. I don't think it was, it was, there was one small, short comment in the closing. All that comment in closing was, we don't know the result. To me, that says, we don't know we're not, if there was, there was no insinuation from that. It wasn't dwelled upon. It wasn't exaggerated. It was short. And it, that was it. Yeah. But it wasn't an issue in the case. That's the argument that Ms. Koros has been making. It wasn't an interesting issue. Well, you think she would have objected. Her, her trial lawyer would have objected then if it was so egregious and such extreme plain error. There was no objection to the testimony and there was no objection to the closing argument, singular remark. None. Okay. So is it so, if it's so egregious, don't you have to, you know, shouldn't she have done something? She shouldn't, shouldn't have been noticed, but they didn't do anything. They were, they weren't, counsel was asleep at the wheel. Okay. That's, that's, I don't think they were beaten. Anybody was beaten over the head, but, but certainly Mr. Fields had to answer questions for, about it. So I didn't know until oral argument today, there were 18 times. That's the first I've heard that Ms. Koros came up with that in oral argument. Okay, fine. She can do that, but at least, and I can't check it, but at least half of them had to be with Mr. Fields because he had to explain why he told Nancy, why there was, why there was a forum. You know, how else could they have gotten this in? Well, I, I, you said you, you weren't there, but I have a document that says you signed, you signed it and let me show it to you, but I can't show you what it is. I'll just show you your signature. Well, it would have been very perplexing to a jury. It would have made no sense. And even, even with what it was, Nancy said, that's not my signature, even though it matched. She said, not mine. Okay. Missing LED. Again, plain air. We, I agree. The trial judge did make a mistake when he said that Mr. Fields testified that he put it in and there was a problem. And this, I did file a motion, a motion to strike an argument that was, was raised for the first time in the reply brief, but leaving that aside, excuse me. Again, this is a, the judge made, made, made the wrong, had the wrong reasoning, but everybody knows the appellate court can rule on anything that appears in the record. And you are here to affirm the judgment, not the reasoning for it. And it was right that his ruling was correct. Dave Fields said he had put it in and they said it wasn't there that day. And, and it was, he was a, a regional driver driving a semi and the law did require, the law did require there to be one. So again, we're going to the credibility. It's relevant to the credibility. Well, was it there or wasn't it there? Is he telling the truth? Is he lying? I mean, certainly can't think that Nancy's telling the truth about anything. And at least Mr. Awad admitted what he had lied. He had more, he had more credibility than his boss because he said, yeah, I lied when I told Dave Fields that it was a yellow light. So, so that that's what it was relevant to. So I don't think that, that, that that was an issue. And I don't think it was an abuse of discretion to instruct the jury. Well, whether, whether, whether it was yellow, red, or otherwise, there was still a duty to yield on the part of your client. And he did yield. So the statute says it's chapter 625, section 511306, vehicular traffic, including vehicles turning right or left shall yield the right-of-way to other vehicles and to pedestrians lawfully within the intersection or an adjacent crosswalk at the time such signal is exhibited. Okay. He was there. It says the earlier part of the statute says that you can proceed into the intersection. You didn't have to wait back before, before the crosswalk, if there was one. He, and I believe there was because Mr. Awad admitted that he lied about saying that he had seen the cross, the don't walk, the walk thing. But so he's there, he waits, he waits, he sees a Cadillac run the light. This is, even defense counsel said at trial, this is your everyday occurrence accident. This happens all the time. The guy waited, he waited, the light was changing, the east-west traffic was starting to go. He was, he had a reasonable concern that that could have, that could have caused a different kind of accident that would have, you know, been t-boned him. He had, he had no reason to think that a second vehicle, he didn't see the second vehicle. In the briefs, they make a point to say, well, he could have if he had looked. Well, well, theoretically that's true, but it's hard to say. He was looking at the Cadillac. He did not see the car. The guy, the light had changed to red, according to defense experts, 3.8 seconds before he entered the intersection. That's a fair amount of time. So, so it's a reasonable question to say, well, did he have the ELD or didn't he? Because there was one there sometime, not sure when, but maybe it was there. How do you know when it's somebody who keeps lying? It's a fair question and a fair inference. Okay. Finally, the third point, loss of a future life. There was no mistake in application of Maddox. It is everyday pain. Loss of a normal life. Let me ask a question. Let me ask you, what evidence, what evidence proves permanency without expert witness testimony in this case? This is, I wish I, I'm sorry, I don't have the IPI instruction of loss of a normal life in front of me. This is my mistake. I'm sorry. He has, it was, the instruction was, I'm sorry, future loss of a normal life, normal life, pain every day, loss of a normal life, not being able to. My question is what evidence was there that was sufficient without expert testimony? The argument is he should have had an expert. Okay. And so I want to know what evidence was there that would make an expert unnecessary? His testimony that he had pain every day. It was a lot of strain. It was loss of a normal life. But he also said he had fully recovered. The doctor said he had fully recovered. He said he couldn't, that he had trouble lifting things above his head. He had trouble. It hurt him. He could still lift his 21 year old. Well, actually that he could, I don't know how much he weighed when he testified that he was afraid, being afraid of future injury. I mean, who's going to testify to that as an expert? I mean, quite honestly, I don't understand this distinction here, probably because of my gender, but you say testicular pain is objective. Yet shoulder pain is not objective. That sounds wrong to me. Of course I can't speak to it, but it just sounds very wrong to me. What do you need? Why would you need somebody? You wouldn't think you'd need somebody for testicular pain, but shoulder pain, back pain. It's the same thing is your life has changed. His life has changed. His wife can't pick up the kid. He's got to do so. It's a loss. It's not, we didn't say permanent injury, future. Anyway, that didn't say future injuries, loss of a normal life. Also defense expert, Dr. Gleason performed an exam on, I'm sorry, an exam on him. And he said that their own expert, that he still has pain. Doctors through Dr. Gleason, and he still is in pain. So that is their expert. Pain is pain, a loss of a normal life. It's changed. You can't do what you did before. Everybody understands that. Just like in Thornton versus Garcini, the Supreme Court case, you don't need an expert to testify that you'd have emotional distress. If you have a halfway delivered fetus coming out of your body, but before the doctor arrives, you have a right emotional distress without an expert for that. This is no different. They could have argued this, but they didn't bother. They decided to go for an all or nothing approach in this case. They didn't dispute the injuries in that regard. They didn't say, you should give a lesser amount. No, they just took their chances and said, we're going to go with all or nothing. He wasn't hurt. Also, I believe that there's one other piece of testimony on this point. I'm sorry. Dr. Burra testified, I believe that there would be some pain in the future. You can use your common sense. You don't have to leave, jurists don't have to leave their common sense at home and nor do judges. You have two shoulder operations. You're not going to be the same. They could have, but they could have argued. He didn't prove it. He still, they could have argued. He still does this. He still does this. He could play basketball if he wants to, but he's afraid. He's a wimp. They didn't argue anything like that. Now they come in crying and it's just not right. They didn't have an expert, but I think that's all I have. Unless you have other questions. Thank you, Ms. Rosen. Okay. Ms. Korofs. Your Honor, I'm going to work in reverse order here. What plaintiff is asking you to do, if Mr. Brungard's testimony about pain alone is sufficient to establish permanency and future damages here, then you're going to need to overrule Maddox. Because Maddox, the plaintiff testified that he had pain every day. He had pain in his lower back and upper back every day and that he had intermittent shoulder pain depending on his activities. And this first district said that isn't sufficient. You need expert testimony. So if you agree with the argument that plaintiff's appellate counsel just made, that him testifying about pain is sufficient and you don't need an expert, then this court has to overrule Maddox. I don't think that that is the appropriate decision to be made here. I do want to touch on, I have not conceded that we are not entitled to a JNOV that the allocation of fault wasn't against the manifest weight of the evidence, but I thought these were meatier issues to address on oral argument. I think as Ms. Rosen said, the JNOV arguments are addressed thoroughly in the briefs. I do want to say that the statute required Mr. Brungard to yield the right-of-way to any vehicle approaching from the opposite direction, which is so close as to constitute an immediate hazard. The left-turning driver is allowed to make their turn only upon the occurrence of a safe interval and is under the specific duty as a left-turning driver to yield the right-of-way to all oncoming traffic that presented an immediate hazard. And you can't, we have pictures in the briefs, this is a big semi-tractor trailer, you can't just say I didn't see him and so I was allowed to proceed through. Because remember, if Mr. Brungard had not turned left, there would have been no collision. He had to be looking, he had to be yielding, he didn't do so. And with this lopsided fault allocation, we have identified some reasons that might have impacted that allocation. And here I will go back to the alcohol evidence, the blood alcohol evidence, and I wanted to make sure that this wasn't just, well, an inadvertent comment or just some background to talk about Nancy's signature. I went back through and counted the 18 references to alcohol and the blood test and why it was required after a collision. And it wasn't predominantly with respect to fields, as Ms. Rosen suggested. 13 times while questioning Nancy, there was discussion, questions talking about what the federal regulations required, why a truck driver has to go and get a blood alcohol test. There were repeated references to the missing and unknown test results that has nothing to do with her signature. Why would you waste valuable court time, jury time, repeatedly hammering on the issue of alcohol blood test, if you didn't want to leave an impression that alcohol was involved? Why would you ask the question, where are the results of the blood alcohol test? We don't know in closing argument. You're right, Justice Walker, it's a non-issue unless you're trying to leave an impression that alcohol was involved. And I will say this, when we monitor trials and we counsel, which we did not do in this case, we tell the parties, don't create error. Don't create reversible error. Don't create plain error. Be careful. And here the plaintiff, by repeatedly hammering home 13 times about blood alcohol testing and unknown test results and then underscoring it in the closing argument, they created plain error. They infected this jury. It was egregious. It deprived the defendants of a fair trial. And we ask for a reversal and a new trial on that basis, as well as the request for relief and the other errors that are discussed in our brief. Carlos, you mentioned that you were going to tell us all the reasons why there was this lopsided thing of 95% versus 95%. You told us about the alcohol evidence, but I thought you were going to give us a litany of things. Mr. Gonzalez was allowed to offer pseudo-expert opinions about stopping distance for semi-trucks and his training manual at UPS. But those, you know, in 20 minutes, we don't have enough time to go through all of them. They are thoroughly addressed in the briefs. So his improper testimony was admitted. We definitely believe that that played a role as well. The arguments that were made about the ELD, especially the missing evidence instruction pertaining to the ELD, that was repeatedly mentioned during closing argument. There was just a landslide of improper evidentiary rulings that either individually or collectively prejudiced the defendants and accounted for this lopsided. Because you have seen in all the cases we cited, you know, the percentages. There's no case in any of the cases cited that has a 95% allocation like this, okay, where it's undisputed that plaintiff turned in front of Awad's vehicle. It's undisputed that Awad entered the intersection on red. We acknowledge that. But if Mr. Brongard had just waited to make his left-hand turn, as he was statutorily required to do, there would have been no collision. So a 5%, 95% allocation is very suspect. My educated guess is that alcohol evidence did play a role in that. And again, they hammered it home repeatedly. So it is not out of bounds to assume that that had an impact. In fact, the trial court said, I believe that this was prejudicial. It should have been redacted if you had asked. I would have done that, but you didn't ask. He said there was no motion in limine. And he was wrong on that. There was a motion in limine. But this is something that the trial judge should have said. Alcohol's out of bounds. There's two things that come to mind with immediately out of bounds. Insurance and alcohol. Those are kind of the two classic reversible error. You don't mention insurance because it's so prejudicial. And you don't mention alcohol unless you've got evidence of impairment because it's so prejudicial. And the defense admits that this was egregious. It prejudiced our defense. And it accounts at least substantially for this very lopsided fault allocation on the record before yours. And at this point, though, we have nothing that show that the jury perhaps ignored what may have been a statutory violation here. So with that, how do we get to the point of reversing a jury verdict? I understand you've given us some great arguments. And I actually agree with much of your argument. But I struggle with vacating a jury's verdict and sending this back for a new trial. So help me a little bit with that, please. And I understand nobody wants a waste of resources, the time of the court, the parties, the expense. I fully understand and respect that. But just look at what we've got here. We don't have an issue, a single problem. We've got a multitude of issues. We've got a lopsided fault allocation. We've got a clear violation of a statutory duty. It's undeniable. And so that fault allocation is against the manifest weight of the evidence, even if you view, as you must, the evidence in the light most favorable to the plaintiff. And even if Nancy's signature was on the document, that really doesn't go to the facts of what happened in that intersection, which are clear and straightforward and suggest a very different fault allocation than 95-5. The alcohol, to me, that alone carries the day that you've got to go back for a new trial. But even if that alone wasn't enough, when you've got the ELD instruction, when you've got the Gonzalez testimony that shouldn't have come in, you've got these inflated future damages claims without expert testimony, it's a cascade of errors that in this instance, we believe at minimum do require a new trial. And we don't make that request lightly. And your question is very thoughtful. And I respect you asking it. But when you look at our briefs, you look at these errors, you look at their impact. And I encourage anyone to go through that testimony. It is just a hammer on that alcohol issue. And there's no justification for it. It had nothing to do with impeachment. It was designed to influence the jury. And we believe it did exactly that. We're actually out of time here, Ms. Cole-Ross. But I'll ask the other justices, do you have any questions? Because we just still ask questions, even though we're out of time. Are there more questions? No. No more questions. Okay. Thank you both. Excellent arguments on both your part. You all are excellent lawyers. And we appreciate excellence. And you brought it to us today, both of you. And so we thank you both for that. We wish every argument we could have, we could have lawyers as refined as the two of you are. So thank you. Have a good day. So much. Have a great day. Yeah. You too. Both of you. All of you. Yeah. Thank you.